UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BILL GROVES, | : | Case No. 3:11-cv-105 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE IS CLOSED

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and therefore unentitled to disability insurance benefits ("DIB"). (*See* Administrative Transcript ("Tr.") (Tr. 26-30) (ALJ's decision)).

## I.

Plaintiff filed an application for disability insurance benefits on May 5, 2005, alleging disability since July 18, 2002. (Tr. 61). Plaintiff alleged disability due to vertebrogenic disorder, carpal tunnel syndrome, hypertension, panic attacks, diabetes, and anxiety. (Tr. 16). Plaintiff's claim was denied initially and upon reconsideration. (Tr. 46, 50). Plaintiff timely filed a request for a hearing. (Tr. 53). A hearing was held before an ALJ on April 22, 2008. (Tr. 500-16). The ALJ denied the claim in a decision dated July 11, 2008, finding that Plaintiff could perform other work. (Tr. 393-407).

Plaintiff requested review of the decision to the Appeals Council and filed a supporting memorandum.  (Tr. 33-35, 38-39).  The Appeals Council issued an order of remand on May 13, 2009, finding that a medical expert was needed to clarify the extent of Plaintiff's limitations.  (Tr. 408-11).

On remand, the ALJ held a new hearing on November 24, 2009.  (Tr. 517-55). Plaintiff appeared with counsel and testified.  Also testifying were Dr. Brahms, a medical expert, and Vanessa Harris, a vocational expert.  (Tr. 16).  The ALJ denied the claim in a decision dated January 22, 2010, again finding that Plaintiff could perform other work. (Tr. 13-30).  Plaintiff again requested review of this decision to the Appeals Council.  (Tr. 11-12).  The Appeals Council denied review in a decision dated February 2, 2011, making the ALJ's decision the Commissioner's final decision.  (Tr. 6-8).  Plaintiff commenced this civil action in federal court pursuant to 42 U.S.C. Section 405(g) for judicial review of the Commissioner's final decision.

Plaintiff was 46 years old on his date last insured, a younger person in the eyes of Social Security.  (Tr. 28).  He has a high school equivalent education.  (*Id.*)  Plaintiff worked in the past primarily as a truck driver.  (Tr. 72, 541).  The ALJ found that Plaintiff could not return to his past relevant work and there is no evidence of transferable skills. (Tr. 28).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1.    The claimant met the insured status requirements of the Social Security Act through December 31, 2005, but not thereafter.

2.　　The claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 18, 2002 through his date last insured of December 31, 2005 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.　　Through his date last insured, the claimant had the following impairments which were severe for Social Security purposes: cervical degenerative disc disease, a history of recurrent bilateral carpal tunnel syndrome, mild to moderate level morbid obesity, dysthymia, and a pain disorder secondary to a combination of physical problems and anxiety (20 CFR 404.1520(c)).

4.　　Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.　　After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant lacked the residual functional capacity to: 1) lift more than five pounds occasionally or ten pounds frequently; 2) do any job where he was not free to alternate positions between sitting and standing at thirty-minute intervals throughout the workday; 3) crawl or climb ladders or scaffolds; 4) more than occasionally crouch, stoop, kneel, or climb stairs; 5) reach above shoulder level more than occasionally; 6) perform fingering with either hand more than occasionally; 7) perform work involving significant exposure of the upper extremities to vibration; 8) follow complex instruction; or 9) do other than low stress work activity (i.e., no job involving fixed production quotas or otherwise involving above average pressure for production, work that is other than routine in nature, or work that is hazardous).  Therefore, he was limited to a reduced range of sedentary work as of his date last insured.

6.　　Through the date last insured, the claimant was not capable of performing his past relevant work as a tractor trailer truck driver.

7.　　The claimant was born on September 9, 1959, and was 46 years old on the date last insured, which classifies him as a younger individual age 45-49 for the purpose of this decision (20 CFR 404.1563).

8.　　The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could have performed (20 CFR 404.1560(c) and 404.1566).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from July 18, 2002, the alleged onset date, through December 31, 2005, his date last insured or thus through the date of this decision (20 CFR 404.1520(g)).

(Tr. 16-30).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to disability insurance benefits.  (Tr. 30).

On appeal, Plaintiff argues that: (1) the ALJ erred at Step 5 of the sequential evaluation where his finding conflicts with Social Security's rules and the vocational expert testimony conflicts with the dictionary of occupational titles; (2) the ALJ erred in his RFC[1] finding where he failed to properly evaluate the opinion of Dr. Chiappone and the other psychological and pain evidence of record; and (3) the ALJ erred in his RFC analysis, where he improperly evaluated for pain and other symptoms.

---

[1]     The Residual Functional Capacity ("RFC") is defined as the most a claimant can still do despite his or her physical or mental limitations."  *Leckenby v. Astrue*, 487 F.3d 626, 631 n. 5 (8th Cir. 2007).  "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."  *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010).

-4-

The Court will address each argument in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen,* 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

The medical record reflects that:

Plaintiff's primary problem involves his hands and neck.  In June 2002, Plaintiff reported difficulty with swelling in his hands to his primary care physician, Noel J. Watson, M.D.  (Tr. 289).  Dr. Watson perscribed Plaintiff nonsteroidal anti-inflammatories with some improvement until Plaintiff returned to work.  (Tr. 288).  Dr. Watson ordered an x-ray of the cervical spine, which showed small spurs anteriorly at the C3-4 and the C4-5 levels.  (Tr. 287).  Dr. Watson felt that Plaintiff had a hand problem and hence sent him to Robert J. Roman, M.D. for evaluation.

On examination, Dr. Roman noted tenderness in both hands, mostly in the distribution of the median nerve, with diminished light touch sensation.  (Tr. 209).  An EMG showed severe right carpal tunnel syndrome on the right and moderate to severe carpal tunnel syndrome on the left.  Dr. Roman recommended surgery.  (Tr. 208).  In late August 2002, Plaintiff underwent a right open carpal tunnel release.  (Tr. 206).  In follow-up, Plaintiff continued to have some difficulty, especially in his thumb.  (Tr. 204-05).

In January 2003, Plaintiff underwent surgery on the left carpal tunnel.  (Tr. 201).  A month after the surgery, Plaintiff felt his left hand was better.  (Tr. 197).  During his recovery, however, Plaintiff reported having difficulty extending his neck past neutral.  Dr. Roman diagnosed a possible cervical radiculitis.  (Tr. 204).  An MRI of the cervical spine showed degenerative changes at C3-4, C4-5 and C5-6 with more severe findings at C6-7.  (Tr. 198).  Dr. Roman recommended that Plaintiff see a neurosurgeon for his neck

problems. (Tr. 196). The neurosurgeon, Marcos Amongero, M.D., did not feel that surgery was justified since the MRI showed left-sided disc herniation, and Plaintiff experienced right-sided symptoms. (Tr. 194).

Plaintiff's pain continued. (Tr. 280-81). In February 2004, he sought out a second opinion from neurosurgeon Gary E. Kraus. Dr. Kraus found decreased sensation to the right thumb and first finger. He noted that Plaintiff complained of neck pain and tenderness along his shoulders and neck. (Tr. 171). He recommended a repeat MRI, which again showed the multilevel findings with the most prominent finding being a leftward disc herniation at C6-7. There was also a significant centralized disc herniation at C7-T1, which showed a significant inferior and slight superior migration into the anterior epidural space. This finding was similar to those described on the MRI in February 2003. (Tr. 170). Dr. Kraus recommended therapy. (Tr. 169). Plaintiff attended therapy to learn a home exercise program in May 2004. (Tr. 172-74). He was also given a home traction unit. (Tr. 176).

However, Plaintiff continued to have pain. In July 2004, he reported to Dr. Kraus that he continued to have pain from the neck down through both upper extremities. Plaintiff felt it traveled in the right upper extremity to the first, second, and third digits, and on the left upper extremity to the thumb. Mr. Gross also had a repeat MRI of the cervical spine performed on July 15, 2004. This showed herniated nucleus pulposus at C6-7 with a compression of the dural sac on the anterior and along the cervical cord,

greater on the left than on the right. There was a small disc bulge at C7-T1, compressing this cord slightly to the right of midline. Dr. Kraus discussed options with Plaintiff and recommended a discectomy. (Tr. 256). A cervical fusion at C6-7 and discectomy was carried out on September 3, 2004. (Tr. 180).

A month after surgery, Plaintiff reported to Dr. Watson that he was pushing to get his arms and thumbs to work so that he could go back to work. However, whenever he pushed himself to work he got more pain. (Tr. 277). In May 2005, Plaintiff reported to Dr. Watson that when he uses his arms they "quit working or they feel like his hands are swelling." (Tr. 274). He felt his hands were less coordinated. He described, for example that "he was trying to drive some screws that he could not completely screw in and he tried to tap them in and suddenly he realized that his right arm was slow to come up, he could not hit the nail or it was not producing any force or any coordination." (*Id.*) Dr. Watson continued to monitor Plaintiff's pain. (Tr. 271). He sent Plaintiff for physical therapy. Plaintiff attended three sessions. (Tr. 267).

In July 2005, the State Agency sent Plaintiff to Loraine Glasser, M.D. for physical examination. (Tr. 210-18). Dr. Glasser noted that Plaintiff was a massively obese middle-aged man who ambulated with a normal gait and had limited range of motion of the cervical spine. (Tr. 211). A State Agency physician reviewed the file following this examination and concluded that Plaintiff could perform medium work exertionally. (Tr. 243). However, he noted that postural limitations could not be performed more than occasionally. (Tr. 244).

In March 2006, Plaintiff was able to get into pain management at the Cincinnati Center for Pain Relief where he was seen by various physicians. (Tr. 314-28). On initial examination, Plaintiff could only flex and extend his neck minimally with some discomfort. There was also discomfort with lateral rotation. (Tr. 327). Plaintiff also reported tingling in his bilateral upper extremities. The pain doctor started Plaintiff on Lyrica and Kadian. (Tr. 328). In June 2007, Jamal Jobalia, M.D. tried a series of cervical epidural steroid injections. (Tr. 314, 316, 318, 356).

Plaintiff also began having greater difficulties with his hands. (Tr. 354). An EMG of the upper extremities on January 30, 2008 showed moderately severe bilateral median nerve lesions at the wrists. (Tr. 352, 392). Dr. Jobalia also felt that there was bilateral old neural nerve entrapment at the elbow, which was moderately severe. He noted continued problems with the neck as well. (Tr. 353).

Because of continued problems with his neck, Plaintiff saw another neurosurgeon, John B. Jacquemin, M.D., on May 19, 2008. (Tr. 477-78). On physical examination, there was a decrease in sensation throughout both hands. (Tr. 477). X-rays of the neck showed a fusion at C6-7 with a plate. Dr. Jacquemin noted the patient appeared to have a static retrolisthesis at C5 on C6 with disc degeneration. He recommended a new MRI of the cervical spine. (Tr. 478). The MRI showed a moderate stenosis at C5-6 level. Dr. Jacquemin recommended cervical revision of the neck with an autograft. (Tr. 476).

Plaintiff underwent surgery on June 25, 2008, for removal of the anterior cervical plate at C6-7.  He also had a complete and radical discectomy at C5-6 with an autograft fusion at that level and an anterior cervical plate.  (Tr. 451).  Dr. Jacquemin surgically observed a "tremendous amount of scar tissue" in the neck, which had to be "taken down."  (Tr. 452).  Dr. Jacquemin also noted a "tremendous amount of scar tissue over the transverse region of the old transverse carpal ligament and the nerve.  (Tr. 453).  The nerve was dissected from the scar tissue and partially released.  (Tr. 453).

Plaintiff reported doing well after surgery with noticeable improvement in his neck pain and right upper extremity symptoms.  (Tr. 474).  By September 2008, Dr. Jacquemin felt Plaintiff was doing well.  Plaintiff was very happy with the improvement in his neck and arm symptoms.  Dr. Jacquemin recommended he continue activity as tolerated and scheduled his left arm for surgery.  Left ulnar nerve and decompression of the left carpal tunnel release was performed in the fall of 2008.  (Tr. 472).  By mid-December 2008, Plaintiff reported that he felt significantly better with respect to the neck and right arm. He still had some posterior neck pain on the right but his right arm was 100% better. Plaintiff felt that the left arm was getting better but it was not as dramatically improved. (Tr. 471).

By April 2009, Plaintiff reported he was feeling much better and looking for work though he did still have some numbness in his left hand.  X-rays continued to show hardware in the appropriate position and the fusion appeared complete.  (Tr. 470).

In addition to his physical problems, Plaintiff has had significant problems with his mental health.  For example, as early as 1998, he reported problems with anxiety noting that he shook and wrung his hands.  His aunt gave him a sample of Xanax and that made him feel like a miracle man. Dr. Watson continued Xanax for generalized anxiety disorder.  (Tr. 308).  Dr. Watson's records indicate Plaintiff did well with anxiety but felt he was completely dysfunctional without Xanax.  (Tr. 298).

In addition to the anxiety, Plaintiff reported problems with depression due to his continued pain.  He was sent by the State Agency for a psychological evaluation in July 2005.  (Tr. 219-223).  During the evaluation, Dr. Chiappone noted that Plaintiff walked slowly and awkwardly.  He complained of pain and appeared uncomfortable sitting for any duration.  (Tr. 220).  Plaintiff emphasized that he did not have a lot of pain with sitting, but during the duration of the interview he appeared to have some difficulty.  (Tr. 221).  Plaintiff came across as slightly anxious and uncomfortable being evaluated.  He appeared depressed with decreased energy and made depressive statements.  Although he stated he never cried, he teared up at one point during the interview.  On mental status examination Plaintiff remembered one of three objects with interference and three of three objects with five-minute delay.  (Tr. 221).

Dr. Chiappone diagnosed a pain disorder due to both psychological disorder and general medical condition (depression), along with an anxiety disorder not otherwise

specified.  Dr. Chiappone assigned a Global Assessment of Functioning ("GAF") of 48.[2]
(Tr. 222).  Dr. Chiappone concluded that Plaintiff could understand simple one-and two-
step instructions. Dr. Chiappone noted Plaintiff was mildly if not moderately impaired in
his ability to relate to coworkers, supervisors and the public. "He related fairly well with
the evaluation but he would have difficulty with give and take on job sites and would
have difficulty with crowds."  (Tr. 221).  Dr. Chiappone also noted that, "Given his pain,
he would probably have an overreaction to feedback in dealing with others. He is
moderately to severely impaired in his ability to carry-out and persist over time due to the
pain and depression." *Id.*

A State agency psychologist reviewed the file following this examination. He
concluded that Plaintiff would be able to perform simple repetitive tasks and stated the
opinion of the consultative examiner was given weight.  (Tr. 224-241).

Plaintiff attended therapy with Thomas W. Heitkemper, Ph.D. beginning in July of
2006.  (Tr. 329-45, 358-62, 456).  In a letter dated March 17, 2008, Dr. Heitkemper
described the problems to the treating pain specialist Dr. Jobalia.  He noted that his
working diagnosis for Plaintiff included major depressive disorder, anxiety not otherwise
specified, and a personality disorder not otherwise specified.  (Tr. 358).

---

[2]  The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100)
used by mental health clinicians and physicians to subjectively rate the social, occupational, and
psychological functioning of adults, e.g., how well or adaptively one is meeting various
problems-in-living.  A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job).

In addition to seeing Dr. Heitkemper, Plaintiff saw a nurse psychiatrist at the South Suburban Mental Health Center for medication management.  (Tr. 366-89, 492-499).  A certified nurse practitioner, S. Jean Budding, CNS, BC, also diagnosed Plaintiff with a major depressive disorder and a generalized anxiety disorder.  (Tr. 366).

In February 2008, Plaintiff was evaluated by Dennis J. Schneider, Ed.D. for a possible spinal cord stimulator implant.  (Tr. 466).  Plaintiff acknowledged that he had problems with depression.  He noted symptoms that included the neglect of hygiene – failing to bathe for two or three days.  Also during these depressive episodes he will not answer the phone or go outside if he is home.  (Tr. 467).  Plaintiff also reported problems with anxiety attacks that occurred once or twice a month.  He had been having these attacks since 1998.  On mental status examination, Dr. Schneider noted that Plaintiff's affect was appropriate but restricted.  His speech volume was low and his rate of speech was deliberate.  His concentration was good and style of thinking was concrete.  An MMPI-2[3] was administered and showed no indications of symptom magnification or exaggeration.  (Tr. 468).  However, because of Plaintiff's significant level of psychological distress and depression, Dr. Schneider did not feel Plaintiff was an optimal candidate at the time for spinal cord stimulators. "It is quite likely that psychological factors are playing a significant role in both his perception of pain, as well as maintaining

_____

[3]     The MMPI-2 is the most widely used and widely researched test of adult psychopathology used by clinicians to assist with the diagnosis of mental disorders adn the selection of appropriate treatment methods.

it. Therefore he is at risk for having limited or no significantly relief from a spinal cord stimulator." (Tr. 468). Dr. Schneider felt that continued psychotherapy would be appropriate. (*Id.*)

At the hearing, Plaintiff agreed that his neck was much better since his surgery in 2008. "The surgery in 2008 was a successful as it was going to get, I do believe." (Tr. 525). Plaintiff noted that he was trying to go back to work, although he was unsure what limitations he might have. (Tr. 525-26). Plaintiff testified that the first surgery on his neck made his head tilt somewhat forward and his shoulders up and he had difficulty with mobility in his neck. (Tr. 526). The second surgery put the fusion in a different place on the right side where he complained his pain came from. This gave him greater range of motion in his neck. (Tr. 527). Plaintiff testified that he still has problems with his thumbs at their base. (*Id.*) He also still has some back issues. "There is pain in my neck which doesn't allow me to get restful sleep." (Tr. 528). Additionally, Plaintiff has pain in his left shoulder. (Tr. 528). Plaintiff estimated that now he could pickup a gallon of milk but he cannot always pour it. (Tr. 529-30).

A medical expert, Dr. Malcolm Brahms, testified. (Tr. 530-39). After reviewing the evidence, he concluded that Plaintiff did not meet or equal any listing, but he felt Plaintiff would be limited to sedentary work. (Tr. 533). In addition, Dr. Brahms did not think that Plaintiff could use his hands for fine manipulation or overhead work more than occasionally. (Tr. 534). Dr. Brahms initially noted that he did not think there would be

-14-

any restrictions on standing or walking.  (*Id*.)  However, on cross-examination, he agreed that an ability to sit/stand at will would be a reasonable accommodation to help Plaintiff complete an eight-hour workday, especially given his obesity.  (Tr. 536-37, 539).  Dr. Brahms also agreed that it would be reasonable based on the record that Plaintiff would sometimes be limited to working only about six hours a day.  (Tr. 538).

A vocational expert testified at the hearing.  She was asked to consider a person of Plaintiff's age, education, and work history who was limited in the manner ultimately found by the ALJ.  (Tr. 540-42).  The vocational expert found there were other jobs such a person could perform such as toy stuffer, nut sorter, and surveillance system monitor at the sedentary level.  She indicated these jobs were representative of approximately 3,500 jobs in the region.  (Tr. 542).

At the April 22, 2008 hearing, Plaintiff testified that he stopped working in July 2002 after he was injured at work.  He underwent cervical fusion surgery and carpal tunnel syndrome release surgery which were both successful.  He testified that he suffered form depression and anxiety and did not want to be around other people and only left his house if it was a "must."  If he did have to go to a store, he got nervous if there was a line, and often walked out without buying what he had picked up.

Plaintiff testified that he spent a typical day listening to music or watching television or otherwise just sitting and ruminating.  He helped clean the dishes a little and helped with laundry, but did not do other housework.  He drove his car three or four times

-15-

a month and went grocery shopping once or twice a month. He did not nap during the day but slept only about five hours at night.[4]

Plaintiff alleges that the ALJ's finding at Step 5 of the sequential evaluation is not supported by substantial evidence or Social Security's rules.

Social Security Rule 96-9p notes that:

> Most unskilled sedentary jobs required good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions. Any significant manipulative limitation of an individuals ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.

Plaintiff maintains that he does not have good use of his hands, and under this Ruling, the unskilled sedentary occupational base is significantly eroded, and, therefore, a finding of disability is appropriate. However, "the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability." SSR 96-9p. Specifically, the Ruling advises the ALJ to consult with a vocational expert ("VE") or the DOT to determine the extent of any erosion of the occupational base and examples of any work the claimant may still be able to perform. SSR 96-9p. This is precisely what the ALJ did in the instant case. Upon presenting the VE with an accurate hypothetical,

---

[4] The new evidence submitted by the Plaintiff is dated long after the Plaintiff's date last insured and shows that Plaintiff's weight is now down to 265 pounds and that he has continued to receive treatment for his impairments, with some improvement in his neck symptoms following a second surgery in June 2008. (Tr. 23).

including Plaintiff's limited use of his hands – the ALJ considered the VE's testimony, identifying 3,500 jobs in the region. (Tr. 541-42).

This Court is mindful of the directive in SSR 96-9p; however, the VE's testimony supports a finding that jobs remain, even given limitations related to Plaintiff's manual dexterity. For disability determinations, the Commissioner may rely on the Medical-Vocational Guidelines, even when there is a non-exertional impairment, as long as the impairment does not significantly diminish an individual's capacity to perform sedentary work. *Bapp v. Bowen*, 802 F.2d 601, 605 (2n Cir. 1986). Moreover, it is critical to point out that no physician ever opined that Plaintiff lacked the physical ability (or manual dexterity) to perform work. The Medical Expert suggested a reduced range of sedentary work, while the state agency physicians opined that Plaintiff could perform a reduced range of medium work. (Tr. 25, 243-49, 533-35, 537-38). While this Court finds that there is significant evidence that Plaintiff was in pain and had limitations, there is no objective medical evidence that the pain was disabling.

Plaintiff's representation that the VE was "mistaken" about the DOT requirements for the nut sorter position does not require remand, because Plaintiff has not shown that the ALJ was aware of the alleged conflict prior to issuing his decision. *Martin v. Comm'r of Soc. Sec.*, Case No. 04-4551, 170 Fed. Appx. 369, 374 (6th Cir. 2006) (while the court agreed that a conflict existed between the VE's testimony and the DOT, the conflict was not apparent during the hearing and there is no affirmative duty on the ALJ to conduct an

independent investigation into the testimony).  Moreover, even if Plaintiff can point to

information in the DOT that is contrary to the VE's testimony, he still has not shown an

actual conflict.  *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) ("the

DOT contains information about most, but not all, occupations.  Moreover . . . the DOT's

job classifications are collective descriptions of occupations that can encompass

numerous jobs . . . .  The fact, therefore, that a VE and the DOT might use different

terminology to describe employment positions does not establish that a conflict exists.").

To the extent an implied or indirect conflict exists, the VE adequately explained her

reasons for deviating from the DOT job descriptions.  *See Washington v. Astrue*, No. 4-

07-cv-770-Y, 2009 U.S. Dist. LEXIS 16621 at *3-4 (N.D. Tex. Mar. 3, 2009).

### B.

Next, Plaintiff maintains that the ALJ erred in his evaluation of Plaintiff's mental

impairments.  Plaintiff focuses on the fact that Dr. Chiappone notes that "[g]iven his pain,

he would probably have an overreaction to feedback in dealing with others.  He is

moderately to severely impaired in his ability to carry-out and persist over time due to the

pain and depression."  The ALJ discounted these limitations, based on the notes from

Plaintiff's primary care physician, Dr. Watson, which indicate that "the claimant's

anxiety caused not more than mild to moderate symptoms."  (Tr. 26).[5]  Moreover, Dr.

---

[5]    Additionally, Dr. Watson addressed Plaintiff's functionality with medication.  This is
substantial evidence that Plaintiff's mental impairments were not disabling.  *See, e.g., Harris v.
Heckler,* 756 F.2d 431, 436 n.2 (6th Cir. 1967) ("Sixth Circuit has consistently held that if a
condition is remediable through medication or treatment, it is not disabling for purposes of a
social security determination.").

Chiappone did not find that Plaintiff was unable to work – he opined simply that Plaintiff had moderate-to-severe limitations in his persistence and assigned a functional GAF score of 55, which is consistent with moderate limitations. (Tr. 221). Moreover, Dr. Chiappone's findings are addressed by the ALJ's RFC limitations for non-complex and low stress work (defined as no fixed production; no above average pressure for production; no non-routine work; no hazardous work). Additionally, this Court declines to give more deference to the opinion of a one-time examiner over Plaintiff's long-time treating physician. *See* 20 C.F.R. § 404.1527(d)(2).[6]

### C.

Finally, Plaintiff alleges that the ALJ erred in his evaluation of pain and other symptoms. Plaintiff alleges that his pain left him unable to sustain even the very limited range of sedentary work identified by the ALJ until he recovered from the 2008 surgery. Additionally, Plaintiff maintains that the ALJ never mentioned the significant amount of scar tissue present in both his neck and wrists when Plaintiff finally found a surgeon willing to address his pain problems. (Tr. 27).

First, no doctor ever opined that the 2008 surgical findings were present during the

---

[6] However, this Court does acknowledge that Dr. Chiappone is a mental health specialist, while Dr. Watson is not. However, on balance, considering the length of Dr. Watson's treatment, and the fact that Dr. Chiappone does not allege severe limitations or disability, the Court finds that the ALJ properly considered Plaintiff's mental impairments.

relevant time frame,[7] and even assuming that Plaintiff could prove a causal relationship between the scar tissue found in 2008 and his pain, he has no evidence that the scar tissue existed at any time prior to his date last insured. *Torres v. Astrue*, 1:10cv109, 2011 U.S. Dist. LEXIS 81203, at *32 (S.D. Ohio July 26, 2011) ("documents generated after expiration of insured status are generally only 'minimally probative' and courts consider them only to the extent that they actually illuminate a claimant's health before expiration of insured status").[8]  Moreover, the objective findings of Drs. Glaser and Kraus in 2004 and 2005 provided substantial evidence that Plaintiff, despite his pain, was not limited in his neck movement, his strength, or his use of his hands.  Additionally, Plaintiff fails to point to any evidence indicating that the ALJ should have found him disabled based on his allegations of pain.

Ultimately, while Plaintiff may disagree with the ALJ's decision, his decision is clearly within the "zone of choices" afforded to him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference.").  Although this is a close

---

[7]  Plaintiff was required to establish that he was disabled on or before December 31, 2005, the date his insured status expired for purposes of Disability Insurance Benefits. *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984).  While Plaintiff was not required to prove he was disabled for a full twelve months prior to the expiration of his insured status, he was required to prove "the onset of disability" prior to the expiration of his insured status and that such disability lasted for a continuous period of twelve months. *Gibson v. Sec'y*, 678 F.2d 653, 654 (6th Cir. 1982).  42 U.S.C. § 423(d)(1)(A).

[8]  *See also Gober v. Astrue*, No. 1:10cv532, 2011 U.S. Dist. LEXIS 78928, at *24 (S.D. Ohio June 20, 2011) ("post insured status evidence of new developments in [a claimant's] condition is generally not relevant").

case, the issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Accordingly, the Court finds that the ALJ's decision is supported by substantial evidence.

**III.**

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Bill Groves was not entitled to disability insurance benefits, be found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case be **CLOSED.**

Date:_____
   1/3/2012

Timothy S. Black
United States District Judge